Good morning, Your Honors. Good morning. This Court has upheld over the years that threats may amount to persecution when it comes to asylum claims. This has included threats alone, meaning that no other harm has been noticed. Unfortunately, the case law has not been completely clear as to when and under what circumstances threats alone are persecution. However, in deciding a case, and in this case I refer back to the immigration judge, because the Board of Immigration Appeals affirmed the case without any comment on it, an immigration judge must at least provide a proper analysis of the threats and why or why not they amounted to persecution. It is not enough for a judge merely to state that death threats received by an asylum applicant are not persecution. In this present case, the immigration judge's decision states only that she has difficulty finding that the threats to the Petitioner reached the level of past persecution. And the only apparent basis given is that Petitioner was not threatened once he withdrew his candidacy for political office. The I.J., in her decision, equated the threats, the death threats that the Petitioner received to his political candidacy. And it seems to be to the judge that once that was withdrawn, it was not past persecution. Is this case essentially that if he goes back, he has this compulsion that he can't resist to run for political office, so he must stay in the United States? Because if he went back and didn't run for political office, there's no showing that he'd be under any threat at all. Well, the fact as to whether or not he would run again for political office if he were returned to Peru really goes towards whether or not he has a well-founded fear, as opposed to the initial issue I started with, which was I'm talking about an objective fear, not a subjective fear. It seems from the record that the only thing he's shown, assuming a past persecution and I don't say that that's been demonstrated, but the only thing of future persecution that he's demonstrated is if he goes back and runs for office, he may be targeted. It strikes me that that's a strange argument that we have, that you get to stay in the United States because you can go back in your home country and live perfectly safe so long as you don't run for office. That's what the evidence shows in the record. Why should that be? Why wasn't the immigration judge right? Well, in terms of returning to Peru and a well-founded fear, in this case, the applicant, as all other people, have a right to participate politically. That is one of the freedoms or the life abilities that is given to people under asylum law. What case do you rely on that a person can get asylum if they go back and they'll be perfectly safe, but they might not be safe if they run for political right? Where is the right that you referred to? What case does it come from? What statute? What constitution? I perhaps wasn't clear. I'm not saying that there is a right to go and run for political office, but to express one's political ideology is very much what is protected by the asylum laws of this country and internationally. In this case, while it may be true, and I'm not willing to concede that, but it may be true that this particular petitioner might not have difficulties unless he ran for office. If that is how his political opinion comes out, if that is his political inclination, he should be able to do that freely. And if in doing that he needs protection from asylum, then this country should grant him asylum. Because he has this inclination to run for office, he's entitled to be in the United States, where if he didn't have an inclination to run for office, he would go back to Peru. Well, that would be somewhat analogous to the idea of having an inclination towards having a political opinion. Not everybody has a political opinion that he or she expresses, but those who are inclined to express them are absolutely, I mean, that's what the case law is full of in asylum, people who expressed political opinions. And as a matter of fact, under Zacarias, I'm sorry, Elia Zacarias, you must make some expression. You can't just be politically neutral. So why should one be able to, how can we protect the right to be able to express a political opinion, but say, oh, but if you can go back safely to your country, just don't run for office? What kind of political freedom is that to express your opinion? I see your argument. On the past persecution, how would you distinguish Lim? Well, in Lim – just give me one moment, Your Honor. In my reading of Lim, actually, Your Honor, I did feel that the Court felt that if it had decided the case, it might have found past persecution. The whole thing in that case was that the record didn't compel a conclusion. Isn't the same thing true here? We're under the same standard of review. The standard of review is the same, yes, but in terms of how the judge put together her decision, she did not even provide a basis for her determination that past persecution was not suffered by this particular petitioner. The record shows that she did mention it. She certainly did mention it, but she certainly didn't provide any analysis, for instance, of the harm he actually suffered as a result of receiving the threats. In other words – In your view, what was the harm that was suffered as a result of receiving the threats? In this case, I would say it was an emotional and psychological harm. Or is that in the record? It's not – it's not directly stated in the record, but I think that the facts of the case set that out. This particular petitioner was a man of means in his country. He owned property, businesses, was well-to-do, and had no problems apart from the problems expressed in his asylum case, living in his country. He fled his home, his country, and even leaving his family behind for a few months because of the threats he received. That speaks to me as having a very deep psychological and emotional impact on a person. Well, how would you – I get – coming back to my question, how would you distinguish Lim? Lim says, neither Lim nor his family was ever touched, robbed, imprisoned, forcibly recruited, detained, interrogated, trespassed upon, or even closely confronted. That's the same thing we have here. And in Lim, we said that's simply not enough. Threats alone are insufficient. So I return to my question. How would you distinguish Lim? Well, again, I would say that I don't think that Lim says that threats alone are not sufficient. In that particular case, the Court found that they – it was not compelled. Well, that's our standard of review. I understand that. The fact is, in that case, there was another determination that was made, and that was that what was compelled by the record was a finding of a well-founded fear of future persecution, which is simply another way into asylum. And I – I think in that respect that there might be a difference here, because I do think that in Lim's case, perhaps, a greater showing towards the well-founded fear could be made based on certain circumstances that occurred after the individual left the country. Counsel, is there – is there any evidence to suggest that even if Mr. Torres did not run for office, if he returned to Peru, that he might be – that he might be persecuted because of his political – his prior political identification? There is some evidence on the record that shows us, and the judge even acknowledged, that some people who had previously been in the political realm were harmed at some future time, as well as the Petitioner's own credible testimony that stated that he was aware of individuals who had returned to Peru after many years. The IJ was concerned about – in part about the passage of time, and I'm wondering whether Sendero Luminoso poses the same threat today that it did when Mr. Torres was in Peru. I'm sorry. I couldn't hear you. I'm looking on page 12 of the – of the IJ's opinion, where – I don't remember if it was he or she – discusses the Respondent's long-time absence, line two, long-time absence from the country, thought it was unlikely that the guerrillas would act violently towards him because of his long-time absence from the country. Is this a – is this a finding by the IJ that there are changed country conditions? Well, I don't think that she really speaks to that issue, having not found that he had shown past persecution. She didn't really even get into that in her analysis. And I think that it bears mentioning that simply having time pass, in and of itself, cannot be assumed to – to lessen a person's fear of going back. What has to be looked at and analyzed is the particular would-be persecutor or previous persecutor. And – Is there any evidence in the record that – that Sendero Luminoso is still active in Peru and active in the region in which Mr. Torres lived? Actually, the – the judge points that out right on the record, that there was some evidence in the record – let me see if I can quickly locate that – that – that indicated – Did the judge say anything about – about whether Mr. Torres could return to Peru but not return to the region in which he lived? In other words, could he – could he go to Lima and – and remain there without fear of threat from Sendero Luminoso? Well, Sendero Luminoso, while the ranks have been pulled, so to speak, over the years, the – the organization has been active throughout Peru. And there has always been evidence of this organization committing terrorist acts, harming individuals, targeting specific individuals in Lima, as well as throughout the country, not only in the region from which Mr. Torres comes. All right, counsel, you've exceeded your time. We will give you one minute for rebuttal. Thank you. May it please the Court, Joan Smiley from the Department of Justice here on behalf of the Attorney General. I would note that the substitution of Alberto R. Gonzalez should be made in this case, and that he has been confirmed as Attorney General. Thank you, counsel. Thank you very much.  Mr. Torres claimed that he received two written threats and hand – writing on his house warning him to withdraw his candidacy as mayor of the village of Moro. There's been no threats or harm after he withdrew his candidacy both in 1986 and 1989. As we pointed out, neither he nor his family was ever detained, interrogated, physically harmed, confronted. How much did Mr. Torres have to – given Sendero Luminoso's well-known activities in Peru, how much did Mr. Torres have to put up with before he could claim persecution? Once people are spray-painting things on his walls and once he gets threats that appear to be from Sendero Luminoso, how much does Mr. Torres have to put up with before we can conclude that he was subject to persecution? Well, under the case law, there must be the subjective and the objective sphere. Okay. The path for – Subjective seems to be satisfied here, and the I.J. finds Mr. Torres to be credible. As the Lim case held, which the panel discussed with my opposing counsel, this court has held that threats of harm that are unfulfilled – in other words, threats without more, which is what we have in this case – does not ordinarily constitute persecution. The court has defined persecution as an extreme concept. Do the threats have to be unfulfilled against the individual, or may threats of a generic nature that have been carried out against others then be good against the person who's claiming them? In other words, if Mr. Torres is aware that threats of this nature have been made against other persons, and those persons have had harm come to them later on, certainly he doesn't have to sit on his hands saying, gee, I sure wish I could leave the country for political reasons, but I can't until I get shot. Well, as the court has held in many decisions which were cited in our brief, the extreme concept of persecution must be menacing enough to cause significant actual suffering or harm, and that's what was found in the Lim decision. Here, from 1986 to 1989, he lived in Lima unharmed. There was no harm to his wife, his family for the nine months that they remained after he came to the United States, and then they followed. He suffered no harm when he returned to Morro on business, which he did when he was living in Lima. He hasn't shown, in fact, that he cannot live safely in Lima or elsewhere in Peru under a... Counsel, what's your response to opposing counsel's position that he should not be required to give up his political aspirations in order to live safely in Peru? Well, there's no evidence that he would have to give up his political aspirations. He's been gone from Peru for 16 years. He was never an elected official, not likely to be a high-profile target under the facts that are in the record. Wasn't he threatened when he ran for office? It's in the record that he became a candidate for mayor twice, in 1986 and 1989, but withdrew his candidacy before the elections. Because of the threats. Because of the threats. Yes. All right. So if he decided to run for office again and were threatened, would that be sufficient to establish a well-founded fear of future persecution? Again, it would depend on the specific facts of the case. But if he were to return to Peru, there's no evidence that he could not run for office, for instance, in Lima or in another village or even in Moro. In fact, the evidence in the record, which the judge referred to on pages 50 and 51 of the record, indicates that the Shining Path is greatly reduced and that the government is working to obliterate them completely. Their leader, Ramirez Durand, was captured in 1999, and the Department of State country report indicates there's a declining threat from Shining Path. Remnants of them are scattered. There's no sophisticated communication or network in which they operate. Therefore, the evidence would suggest that he could run for office if he would like to. In the record, it indicated that Shining Path targeted small-town mayors and that a couple of them had been assassinated. Yes, in 1989. Which threats apparently were carried out. That is correct. But again, small-town mayors, and he was running to become a small-town mayor. He was running, but withdrew his candidacy twice. And it's interesting, his mother, who had similar democratic ideals, according to petitioner's testimony, had no threats made against her after she left for Lima. And the testimony was that she spends half her time in Lima and half her time in the United States and has not been harmed in any way. I'm just talking about the past discrimination now. I understand your argument that things have changed. Suppose that in the town right next to Morrow, a mayor had been assassinated. Would that make a difference? Would the threats become – would that – would you distinguish Lim on the basis that in a Well, I would have to know what the facts of the case were in terms of what threats were made against the individual who was running. Or maybe no threats were made. It would depend on what had occurred and whether the individual had a subjective and objective fear as required. As the court is well aware, the standard – Not past discrimination, not future discrimination. I'm sorry, I didn't hear you. I'm talking about past discrimination, not future discrimination. In this case, the judge found, of course, that there was no past persecution and no well-founded fear of persecution. I understand. Whether that would change under a different fact scenario is possible. I understand, but you don't mind us asking hypothetical questions just to clarify your point, do you? Sure. Oh, no, Your Honor. Okay. In Lim, it says that there's no family was touched, robbed in prison, or forcibly recruited. And I just wondered how absolute that language is. Suppose in a town five miles away, a mayor was threatened by Shining Path and assassinated. And then threats are given to this individual, and he decides not to run. Would that be past persecution, or would we say because he had not been touched, imprisoned, or forcibly recruited or detained, that the threats alone are insufficient? It would appear that the threats would be insufficient under the facts you've described. There would be no actual significant suffering or harm, which the court laid out in Lim as the standard that they were looking for. Under the facts that you've described, it would not appear that there would have been past persecution. So he doesn't actually come under Lim until he's shot. He's been touched in some way. Well, no, it doesn't require that he be shot. It's just that Lim has held the threats of harm without more. Yeah. It does not ordinarily constitute persecution. Or be that you are aware of other people in sort of your category that have been shot. Or acts that have been directed against you, other than unfulfilled threats. Well, he's had threats against him, and he's aware of other people who have had threats made against them that have then had actions taken against them. Does he have to wait until Shining Path takes a shot at him before he can claim persecution? No, not necessarily. There could be other sorts of threats made that would constitute past persecution, surely. But in this instance, the judge found that he had not demonstrated enough to show that he was persecuted or had a well-founded fear of persecution. I guess that's what we're asking. How much does it take to get to cross that line? The case law has set out... A pot shot would be easy. That would be nice. But does Mr. Torres have to wait until somebody actually shoots at him? No, he does not. And the cases have held in many different respects that there could be threats and other acts taken. It doesn't have to be a shooting. But under the deferential standard of review that's applicable to this case, the judge's decision does not compel reversal here. There's substantial evidence to support the decision. I know that he does not claim any persecution while he was living in Lima. Did the IJ specifically find that he was capable of moving elsewhere in the country and being free from persecution from Sendero Luminoso? Well, she did find that he had been gone for many years, that he had lived safely in Lima from 1986 to 1989, that he was not an elected official. If he's capable of moving elsewhere in the country... Well, Lima is elsewhere, of course, from Moro. If he's capable of moving elsewhere in the country and avoiding Sendero Luminoso and avoiding persecution, is that sufficient grounds for claiming that he has no future fear of persecution? Well, that would certainly go into this decision, and that did go into the judge's decision in this instance. She found that the threat of Shining Path was greatly reduced and that the leader had been captured, the government was stamping out Shining Path all over Peru, and she found that he had indeed lived safely in Lima, had traveled... I think you just shifted arguments, and it may be a good one, but I do think you just shifted arguments on me. I think you just shifted to a claim that there are changed country conditions. That's not what we argued in our brief, Your Honor. But the judge did find that there was a very... You're not relying on a changed country conditions? No. We're relying on the evidence in the case, which includes the State Department country report that shows there is a declining threat from Shining Path and that there's no real network operating in the country. For all of those reasons, the immigration judge's decision was correct and should be affirmed. Unless the panel has anything further, we would rely on the brief filed in the case. Thank you, counsel. One minute for rebuttal. Your Honors, regarding Lim and some of the verbiage that was used in that case, that court stated that only when the threats are so menacing as to cause significant actual suffering or harm. However, that paragraph continues that and sort of explains this idea. Threats themselves are sometimes hollow, and while uniformly unpleasant, often do not affect significant actual suffering or harm. That does differ from the case at Barb because of the fact that these threats were not hollow threats. Nothing in the record even suggests that, let alone supports the idea, that the threats made to the Petitioner in this case were hollow. They were made by an organization that had the current will, intent, ability, everything to go forward with them. Ms. Seiden, can he return to Lima and live safely there without fear of persecution from Sendero Luminoso? And if so, why isn't that sufficient? Well, number one, I think that it depends on whether we're starting from the vantage point that he has shown past persecution. Let's assume that he's shown past persecution. But if there's an alternative, if there's sort of a good alternative for him to live safely in his native country, then is he still entitled to asylum here just because he wants to live in Moro but he can live safely in Lima? I understand. He's already abandoned his property in Moro, right? He's not getting the property back. That's correct, John, and I understand. He has no property to return to in Moro. Correct. Would he automatically qualify if it were shown that he could not live safely in Lima? No. Does the record at least suggest that he might have the same difficulties when and if he were to put out his political opinion and take political action again? The record does suggest that he would have the same difficulties. In Lima? In Lima. Where is that in the record? There is an accounting. Sendero Luminoso, active in Lima? Well, there is an accounting that in the record where the judge even specifically states that she acknowledges that there was some documentation in the record that Shining Path still takes retribution. It does not specifically state in her decision whether or not they're in Lima. And I'm not aware at this moment as we stand here of a specific document that does show that. But he lived in Lima for some time and didn't have any problems. That is correct. And at the time he was not politically active, having run from the threats, he had already suffered. All right. Thank you, counsel. Your time has expired. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is the Valles-Diez versus Ashpah. Thank you.
judges: Wallace, Rawlinson, Bybee